[No. 4154.   Decided May 10, 1902.]

BURNS  W.  BEALL,  *Appellant,*  v.  CITY  OF  SEATTLE,
*Respondent.*

MUNICIPAL CORPORATIONS — CONSTRUCTION AND USE OF SIDEWALK
BASEMENT — NOTICE TO CITY.

Where a permit for the alteration of the basement of a build-
ing and the construction of a stairway under the sidewalk was
granted by the proper city official, whose duty it was not only to
grant such permits, but inspect the work in progress, and such of-
ficial was informed of the intent of the owner of the building
to use the space underneath the sidewalk for the construction
and operation of a heating plant, which was located at that place
without compliance with the ordinance regulating the use of
spaces under sidewalks adjoining buildings, a question is pre-
sented for the jury as to whether the city had actual notice of
such unlawful use of the sidewalk, or had notice sufficient to put
it upon inquiry.

SAME — EXPLOSION UNDER SIDEWALK — LIABILITY OF CITY.

Where a traveler upon a highway is injured as the result of
the explosion of an unseen instrument within the area of the
street over which a city has control, a *prima facie* case of negli-
gence is established against the city, regardless of whether con-
tractual relations exist between the city and the person injured.

Appeal from Superior Court, King County.—Hon.
FRANK H. RUDKIN, Judge.  Reversed.

*Shank & Smith,* for appellant.

*W. E. Humphrey* and *Edward Von Tobel,* for respond-
ent.

The opinion of the court was delivered by

HADLEY, J.—This action was brought by the appellant
against the respondent to recover damages for personal in-
juries received from an explosion which occurred under-
neath the sidewalk on which the appellant was walking,

near the corner of Second avenue South and Washington street, in the city of Seattle. The complaint alleges that prior to March 21, 1899, the date of the accident, one Van der Van was the owner of certain premises in Seattle, extending along Second avenue South, and also of a business block erected thereon; that with the knowledge and con-·sent of respondent, the said owner utilized, in connection with the said building, the space underneath the sidewalk adjoining the said premises on the west side of Second avenue South, and placed immediately beneath the sidewalk, within the limits of said street, a certain hot water boiler and connections, constructed in such a manner as to carry steam; that, with the knowledge and consent of respondent, said apparatus was placed beneath the sidewalk in a negligent and unlawful manner, and without an inspection thereof; that respondent permitted the use of said space below the sidewalk in connection with said building without requiring the owner thereof to comply with the ordinances of the city of Seattle; that the sidewalk thus extended above said apparatus was open to the public as a highway for pedestrians, and was apparently in all ways safe for travel, there being nothing to indicate the presence of said boiler thereunder, and the plaintiff had no knowledge or warning thereof; that on the date aforesaid while the plaintiff was walking upon said sidewalk, the said boiler exploded with terrific force at the moment when the plaintiff was exactly above it, hurling the plaintiff into the air to a height of thirty feet, whence he fell with great force upon the hard, uneven surface of the ground; that the plaintiff was thereby seriously wounded and injured, and he therefore demands damages. The answer is a general denial. The cause came on for trial before a jury, and at the conclusion of the plaintiff's testimony the court granted

a motion for non-suit. Plaintiff moved for a new trial, which was denied, and judgment was thereupon entered dismissing the action and taxing costs to the plaintiff. From said judgment, plaintiff appeals.

It is assigned as error that the court took the case from the jury and entered judgment of non-suit; also that the court erred in holding that notice to the assistant building inspector of the placing of the heating apparatus beneath the sidewalk was not notice to the city. The proofs show that the appellant, a commercial traveler who resides·in St. Louis, was at the time of the explosion walking upon the sidewalk immediately over the location of said boiler. Two companions were with him, between whom appellant was walking. The force of the explosion seems to have centered at about the point where appellant and his companions were walking. The sidewalk was torn up and destroyed, and appellant's companions received injuries from which each died the same night. Appellant was covered with soot so that he was almost unrecognizable, was for the most part unconscious for two days, and received severe and probably permanent injury about the foot, besides a shock to his nervous system of a serious and damaging character. Under the evidence as introduced, it is manifest that appellant received injuries which were due to the explosion of the boiler under the sidewalk, and the question to be determined is, was there evidence tending to show negligence on the part of the city, that should have been submitted to the jury?

The evidence shows that the owner of the premises adjoining the sidewalk under which the explosion occurred employed a carpenter to finish the incompleted basement of his building, put an outside stairway thirty inches in width down from the sidewalk, and make certain other repairs in

the basement. Before commencing the work the carpenter applied to the secretary of the board of public works for a permit, and after stating the location of the premises as being within the fire limits, he was referred by the secretary to a Mr. Josenhans, the assistant building inspector. Mr. Thomson, the city engineer, and also chairman of the board of public works, testified that Josenhans was the assistant building inspector, and that applications for permits within the fire limits were referred by the secretary of the board of public works to either the inspector or assistant inspector of buildings. The permit to do the repair work was issued; and the carpenter, Mr. Hamilton, testified that when he applied for the permit he also made application for a permit to move out under the sidewalk the heating apparatus then located in the unfinished basement of the building. He further testified that, after he explained what he desired to do, the inspector told him he needed no permit to move the heating apparatus, and then directed him how to place the boiler in the proposed position under the sidewalk. Hamilton testified that he followed the directions of the inspector. The testimony shows that up to this time the basement was not only unfinished, but was simply a hole in the ground, filled with trash and rubbish, and that the space under the sidewalk was in the same condition. The outside of the sidewalk rested upon wooden blocks or piles, with a stringer running lengthwise of the walk, supporting wooden cross joists with planks above. Ordinance No. 2833 of the city of Seattle provides as follows:

"Section 22. Any person desirous of utilizing the under side of the sidewalks in front of any building owned by him shall construct a sufficient stone or hard brick wall, not less than two feet thick, to be laid in one part cement and four parts sand, to retain the roadway of the street,

and shall extend the side, division or party walls of such building under the sidewalk to such curb wall. The sidewalks in all cases shall be of incombustible material entire, supported by walls or iron beams in accordance with the following schedule: (here follow details for construction.)"

It is manifest, under the evidence as it now stands, that the space under the sidewalk was being utilized without a compliance with the requirements of said ordinance. When the owner of this building sought to use the space under the sidewalk, it involved the alteration of the building by way of the extension of the side walls and otherwise as required by said ordinance. Being in the nature of an extension to the building, and for its use and benefit, the work therefore became, in effect, an alteration of the building itself. This alteration necessarily involved the use of the materials and the manner of construction for the extended side walls and the sidewalk and its supports required by the ordinance aforesaid, and an inspection of the work as it progressed or when completed might have disclosed the manner of construction, and the location of this boiler, with its attachments connecting it with the main building. Ordinance No. 2662 provides that the board of public works shall appoint a superintendent of buildings, bridges, and wharves. Among other duties designated for him, § 5 of said ordinance provides as follows:

"It shall be the duty of the superintendent to visit each house, building, wharf or bridge which may be in the course of erection, construction or alteration within the limits of the city of Seattle and to see that said building, bridge or wharf is being erected, constructed or altered according to the provisions of the city ordinances; that the materials used are suitable for the purpose; that the structure is of sufficient strength and solidity to answer the purpose for which it is designed; that the foundation is down to the

required depth to get the best bearing that can be obtained, and if the nature of the soil requires piling, flagging or lagging, to see that it shall be done."

It is thus clearly made the duty of the superintendent to examine and inspect each building in course of erection or alteration. It is also provided that he shall keep a record of all permits issued. The permit issued in this instance specifically authorized the construction of a stairway thirty inches wide down from the sidewalk to the basement, and the application not only disclosed that it was the intention to use at least a portion of the space under the sidewalk for the stairway purposes, but the permit actually authorized it. In any view of the matter, it would therefore appear that the city had actual notice that *some* alterations were being made under that sidewalk as an attachment to, and for the benefit of, that building, and that actual consent to make the alterations to the extent required for stairway purposes was given. We do not think it can be said, as a matter of law, that a proper inspection of that completed work, as required by the ordinances of the city, would not have led to the discovery of the entire situation there, including the location of the boiler and its attachments. We think it is at least a question for the jury to determine whether, with the exercise of reasonable care under the circumstances, the city should have known that this boiler was there located, and the purposes for which it was so placed. Moreover, as we have seen, Mr. Thomson, chairman of the board of public works, testified that Josenhans, the assistant building inspector, was a proper official to whom should be referred the matter of permits for building alterations within the fire limits; and Hamilton, the carpenter, testified that he not only told Josenhans that he intended to place the boiler under the

sidewalk, but actually received instructions from him as to the manner of placing it. We think, under the evidence as it now stands, that Josenhans occupied such a position in the premises as made notice to him notice to the city. Whatever notice was involved in the conversation between him and Hamilton related to something that was yet to be done, and not to what had been done, and it is urged that it could not be notice that the thing was actually done. Strictly speaking, it probably cannot be said to have been notice of the thing actually accomplished; but, being an expression of intention to do a thing, we think it was such notice as at least emphasized the duty of an inspection to discover what was really done, and it is for the jury to say whether that duty was neglected. If no inspection was ever made of the premises after the receipt of notice of intention to place this boiler under the sidewalk as an attachment to the building, then, without other testimony, the jury would be justified in finding that no objection was made by the city, and that it consented thereto. There is testimony in the record to the effect that no inspection of the premises was ever made by any city official either during the progress of the work or after its completion. The work of placing the boiler and making the alterations was done in December, 1898, and the explosion occurred in March, 1899. Under all the circumstances, we think it cannot be said, as a matter of law, that the city had no notice of the existing conditions; and, for further purposes of this opinion in the consideration of the motion for nonsuit, it must be held that there was sufficient evidence to go to the jury upon that subject.

With knowledge of the conditions brought home to the city, what is the status of the case, without further testimony? It is a well-settled principle that a traveler upon a

public highway has a right to assume that it is safe for ordinary modes of travel. This principle is well stated in Williams on Municipal Liability for Tort, § 128, as follows:

"In the absence of anything that would suggest to the mind of a man of ordinary prudence a peril of travel, a person who is passing along a public highway is not bound to anticipate danger, but has a right to assume that the municipal authorities have made the way reasonably safe for public travel in the ordinary modes. And he may indulge in this assumption as well when he is traveling in the night-time as when he is traveling by daylight. 'A person may walk or drive in the darkness of the night,' says Chief Justice HUNT in *Davenport v. Ruckman,* 'relying upon the belief that the corporation has performed its duty and that the street or the walk is in a safe condition. He walks by a faith justified by law, and if his faith is unfounded and he suffers an injury, the party in fault must respond in damages.'"

Applying the above rule to the case at bar, we find, as the evidence stands, that the appellant was walking upon a public highway of the respondent city, entirely unconscious of any present danger, when he was instantly subjected to great danger by a violent explosion from a source concealed immediately under the highway upon which he walked.

In *Abilene v. Cowperthwait,* 52 Kan. 324 (34 Pac. 795), a lot owner had made a dangerous cellarway under a sidewalk and street in front of his house, which he covered with a trap door. It remained in that condition for about two months, when a person traveling over the sidewalk stepped upon the trap door, which broke down and precipitated him into the excavation below, causing severe personal injuries. It was held that the city could not relieve itself from responsibility because the dangerous open-

ing was made by a lot owner, and, further, that it was the
duty of the city authorities to supervise the work of cover-
ing the cellarway, and to cause the use of suitable precau-
tions to prevent accidents.   Under similar circumstances,
it was held in *Morris v. Woodburn,* 57 Ohio St. 330 (48
N. E. 1097), that the injured party may elect to sue
either the party creating the nuisance, or the city for its
tort in failing to discharge a duty imposed by law.

This court said in *Saylor v. Montesano,* 11 Wash. 328,
333 (39 Pac. 653):

"That this particular portion of the street was not in a
safe condition was demonstrated by what actually hap-
pened thereon.   Respondent not only had a right to drive
over any portion of the street, but a right to expect that
all portions of it were in a safe condition for ordinary
use."

In *Hume v. Mayor,* 74 N. Y. 264, injuries had been
received from a wooden awning constructed in the street.
The court, at pp. 274, 275 of the opinion, said:

"Regarding then the ordinance referred to as still in
force as is claimed by the defendant, it appears that it re-
quired that the erection should be made under the direc-
tion of the street commissioner.   If under the direction of
that officer, or through his neglect to supervise it, it was
constructed in a negligent and insecure manner, and in-
jury to an individual ensued, the city would be liable for
such negligence (*Wendell v. City of Troy,* 39 Barb. 337,
and S. C., 4 Keyes, 261), and this liability would exist
even if the defect were not patent.   (Ibid.)   If the erec-
tion was made without authority from the city and without
the approval or direction of the street commissioner, then
it was an unlawful erection in the public streets by an in-
dividual for his private purposes, which the jury have
found to be obviously unsafe and dangerous to persons
using the street, and which it was the duty of the officers

of the city to cause to be removed, after having actual or implied notice of its existence."

In *Chicago v. Robbins,* 2 Black, 418, 422, Mr. Justice DAVIS says:

"It is well settled that a municipal corporation having the exclusive care and control of the streets, is obliged to see that they are kept safe for the passage of persons and property, and to abate all nuisances that might prove dangerous; and if this plain duty is neglected, and any one is injured, it is liable for the damages sustained."

In *Wells v. Brooklyn,* 41 N. Y. Supp. 143, a showcase was maintained on a sidewalk without permission of the municipal authorities; and the city was held liable for injuries caused by its fall, though it had been securely fastened until the day before the accident, when a truck collided with it and broke it loose. The contention was made in behalf of the city that an essential element of its liability was that the obstruction should have been actually dangerous in the first instance, or manifestly likely to become so, in the judgment of prudent men, and that, if originally it was neither, the fact that it subsequently developed into a menace to public travel did not render the municipality chargeable with negligence for the resulting injury. Upon this subject the learned writer of the opinion says at p. 145:

"I think this is too limited a view of the rule of law applicable to such a case, both upon reason and authority. When a municipality tolerates for years the continuance of an unlawful obstruction in a public street, which it is in duty bound to remove therefrom, its action is distinctly wrongful. It must bear the natural consequences of that wrongful action. Any unlawful obstruction in a public highway may prove dangerous to travelers, either from the manner in which it is originally erected, or by reason of accidental or other interference with it by strangers to its

erection. Notice to the municipality, therefore, of its presence, is notice that the safety of public travel is endangered, or liable to be endangered. If, under such circumstances, the obstruction is allowed to remain, the municipality takes the risk. If injury ensues, the presence of the obstruction is to be deemed the proximate cause thereof, for the injury could not have happened if the municipal authorities had performed their duty. In that event, in the case at bar, the showcase would not have been on Grand street at all, and could not have been loosened by the collision with the truck, or fallen upon the plaintiff."

In the case at bar, as we have seen, this boiler was being maintained as an attachment to a building, but located within the limits of a public street, under conditions which were in violation of a city ordinance. If the extended side walls, the supporting stone or brick wall laid in cement, and the stronger overhead structure, had been constructed, as required by the ordinance, at places where the space beneath the sidewalk is used, who can say that appellant would have been injured? The defect in the boiler, if there was a defect in the beginning, may not have been patent; but, under the evidence as it now stands, the boiler was maintained and operated there for a period of three months under unlawful conditions. It may therefore have been a nuisance which it was the duty of the city to abate, whether there was any apparent defect in the structure of the boiler or not.

Appellant was injured by an unseen instrument exploding within the area of the street over which the city had control. We think, when he had shown those facts that a *prima facie* case of negligence was established, and that it devolves upon the city to show that it exercised reasonable care in the premises, in order to overcome the presumption of negligence arising from the fact of the explosion. An

explosion being a thing so unforeseen and unexpected in its nature, it is held that negligence will be presumed, if unexplained. There is some conflict in authority upon this subject, but we believe the better reasoning and the weight of authority support the above statement of the law. Some distinction has been made between cases where contractual relations exist between the parties, and those where there is no such relation; it being held that, when such relation exists, proof of the explosion carries with it the presumption of negligence, and makes a *prima facie* case, when such would not be true if the contractual relation did not exist. We think the better reasoning is with those cases which hold that the presumption arises not only in favor of those sustaining contractual ties, but in favor of all others as well. The duty to exercise reasonable care in the maintenance and operation of instrumentalities and devices liable to explosion runs to all mankind. In support of this view, see the following cases: *Judson v. Giant Powder Co.,* 107 Cal. 549 (40 Pac. 1020, 29 L. R. A. 718, 48 Am. St. Rep. 146) ; *Warn v. Davis Oil Co.,* 61 Fed. 631; *Rose v. Stephens, etc., Transp. Co.,* 11 Fed. 438; *Illinois Central R. R. Co. v. Phillips,* 49 Ill. 234; *Posey v. Scoville,* 10 Fed. 140; *Robinson v. New York Central, etc., R. R. Co.,* 20 Blatch. 338; *Klepsch v. Donald,* 4 Wash. 436 (30 Pac. 991, 31 Am. St. Rep. 936).

For the reasons hereinbefore assigned, we think there was such evidence as should have been submitted to the jury, and we therefore believe the court erred in granting the motion for nonsuit. The judgment is reversed, and the cause remanded, with instructions to grant a new trial.

REAVIS, C. J., and FULLERTON, ANDERS, DUNBAR, MOUNT and WHITE, JJ., concur.